1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRISTA DAWN ABELOE, | 1:11-cv-01332-SKO |
| Plaintiff, | **ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT** |
| v. | (Doc. 12) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
| Defendant. | |

## BACKGROUND

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") pursuant to Titles II and XVI, respectively, of the Social Security Act (the "Act").  42 U.S.C. §§ 401 *et seq*.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  (Docs. 2, 8.)

**FACTUAL BACKGROUND**

Plaintiff was born in 1970, has completed a general education equivalency certificate ("GED") as well as some college classes, and previously worked as a lab technician and a certified nurse assistant ("CNA"). (Administrative Record ("AR") 33, 157.) Plaintiff contends that her ability to work is precluded by chronic fatigue, immune dysfunction syndrome, fibromyalgia, depression, and anxiety. (AR 156.)

**A.    Medical Evidence**

Plaintiff sought treatment at the Family HealthCare Network between 2002 and 2009 for a variety of conditions. (AR 475-557.) Plaintiff frequently was seen for chronic pain and was treated by numerous physicians and medical professionals at the Family HealthCare Network. (*See, e.g.,* AR  452, 454, 479, 485, 494, 499.)

On November 3, 2007, Plaintiff was examined by state agency physician James A. Nowlan, Jr., M.D. (AR 407-10.)  In discussing Plaintiff's medical records that Dr. Nowlan reviewed, Dr. Nowlan indicated that, although a diagnosis of interstitial cystitis was made, there was nothing that showed why the diagnosis was made. (AR 407.)  Similarly, although the medical records showed a diagnosis for fibromyalgia, there was nothing to indicate the basis for the diagnosis. (AR 407.)

Plaintiff reported to Dr. Nowlan that she experiences pain all over her body, which began after receiving a hepatitis vaccine. (AR 407.)  Although the intensity of her pain varies, the pain increases upon activity. (AR 407.)  Plaintiff is tired all the time "and can hardly do anything." (AR 407.)  She runs a fever every day, but if she lies down for a while her temperature returns to normal. (AR 407.)

On examination, Plaintiff's coordination, station, and gate were found to be normal, and she was negative on the straight-leg raise test in both a seated and supine position. (AR 408-09.)  Her motor strength was 5/5 throughout in the bilateral upper and lower extremities. (AR 409.)  Dr. Nowlan recorded that "[s]he was obese.  There were no painful responses to movement of her extremities throughout all the range of motion, or from getting off and on the table or walking down the hall, although she walked slowly." (AR 409.)  Dr. Nowlan's functional assessment of Plaintiff is as follows:

> There is nothing in the physical exam to document that she is having pain. We had no thermometer to take her temperature with. Range of motion of her hip was done, without any painful response whatsoever.
>
> She could stand and walk for six hours in an eight-hour day. If there were any limits they would be produced by the obesity.
>
> Sitting would be unlimited. She needed no assistive devices. She could lift 20 pounds frequently and 40 pounds occasionally. There were no postural or manipulative limitations.

(AR 410.)

On November 17, 2007, Plaintiff was seen by Greg Hirokawa, Ph.D., for a psychiatric evaluation. (AR 411-16.) Plaintiff reported to Dr. Hirokawa that she felt depressed and anxious, she slept poorly, she was frustrated and irritable, she experienced memory problems and mood swings, she was withdrawn and experienced a loss of interest in things, and she had difficulty concentrating. (AR 411.) She reported a long history of depression and anxiety and described her childhood as dysfunctional. (AR 411.) Plaintiff noted that her anxiety had worsened due to her physical problems, financial issues, and not being able to work and do the things she enjoys. (AR 411.)

Plaintiff also reported that she did some cooking and light household chores, but primarily she stays home and cares for her children. (AR 414.) Dr. Hirokawa discussed Plaintiff's prognosis as follows:

> The claimant's symptoms of depression and anxiety appear to be within the mild range and primarily due to her physical problems and the associated limitations. The claimant's overall communication skills were fair.
>
> The claimant is currently prescribed psychotropic medication by her primary care physician. Response to treatment has been fair. The likelihood of the claimant's mental condition improving within the next 12 months is fair.
>
> The claimant has had a positive work history consisting of maintaining a steady job for an extended period of time. She also appears to have a personality disorder.

(AR 415.)

Dr. Hirokawa also offered his opinions as to Plaintiff's mental functional abilities:

> The claimant's ability to remember locations and work-like procedures is mildly to moderately limited. The claimant's ability to understand and remember very short and simple instructions is mildly limited. The claimant's ability to understand and remember detailed instructions is mildly to moderately limited.

The claimant's ability to carry out very short and simple instructions is mildly to moderately limited. The claimant's ability to maintain attention and concentration for extended periods is mildly to moderately limited.

The claimant's ability to accept instructions from supervisors and respond appropriately to criticism is mildly to moderately limited. The claimant's social judgment and awareness of socially appropriate behavior was mildly to moderately limited.

The claimant's ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances is mildly to moderately limited. The claimant's ability to function independently and sustain an ordinary routine without special supervision is mildly to moderately limited.

The claimant's ability to complete a normal workday/workweek without interruption from psychologically based symptoms and perform at a consistent pace is mildly to moderately limited.

The claimant's ability to interact with coworkers and the general public is mildly to moderately limited. The claimant's ability to withstand the stress of a routine workday and deal with various changes in the work setting is mildly to moderately limited.

The likelihood of the claimant emotionally deteriorating in a work environment is minimal to moderate.

(AR 415-16.)

In December 2007, consultative state-agency physician, James V. Glaser, M.D., reviewed Plaintiff's medical records and determined that Plaintiff could lift and carry up to 50 pounds occasionally and 25 pounds frequently and could sit, stand, or walk about six hours in an eight-hour day. (AR 418.) Dr. Glaser determined that Plaintiff had no postural limitations. (AR 418-19.) Dr. Glaser also noted that there were no examination findings identifying tender points as to fibromyalgia. (AR 423.)

On December 6, 2007, consultative state-agency physician Evangeline A. Murillo, M.D., completed a mental functional capacity assessment. (AR 447-49.) She concluded that Plaintiff was able to perform simple, repetitive tasks on a sustained basis and that Plaintiff was able to relate and adapt to work changes. (AR 449.)

On March 14, 2008, consultative state-agency physician Achimedes Garcia, M.D., reviewed Plaintiff's medical records and affirmed Dr. Murillo's findings. (AR 473-74.)

On August 7, 2009, Plaintiff's treating physician, Narwhals Mating, M.D., completed a fibromyalgia residual functional questionnaire. (AR 552-57.) Dr. Mating diagnosed Plaintiff with fibromyalgia, chronic fatigue syndrome, and trigeminal neuralgia. (AR 552.) In identifying the clinical findings, laboratory, and test results establishing Plaintiff's conditions, Dr. Mating ostensibly reported Plaintiff's subjective complaint that it "hurts everywhere especially arms [and] legs." (AR 552.) Dr. Mating checked boxes on the form indicating that Plaintiff had multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, irritable bowel syndrome, depression, multiple trigger points, numbness and tingling, dysmenorrhea, anxiety, and frequent severe headaches. (AR 553.) It was also noted that Plaintiff suffered from pain in her cervical and thoracic spine, as well as in her left shoulder, arms, hands/fingers, hips, legs, and feet. (AR 553.) Dr. Mating opined that Plaintiff would be able to concentrate for no more than five minutes at one time, and that she was incapable of working at a "low-stress" job. (AR 555.) Dr. Mating further opined that Plaintiff could walk half a city block without pain, and she could sit or stand for no more than 15 minutes at any one time. (AR 555.) Plaintiff was able to walk for five minutes out of every 15 minutes. (AR 555-56.) Plaintiff could rarely lift 10 pounds, and could never lift more than 20 pounds. (AR 556.)

**B.    Third Party Non-Expert Testimony**

On September 8, 2007, Plaintiff's husband, Stephen Abeloe, completed a Third Party Adult Function report stating his observations of Plaintiff's condition. (AR 186-93.) According to Mr. Abeloe, Plaintiff spends her day by making breakfast for her children, resting until lunchtime, making lunch for the children, and taking a nap in the afternoon until dinner time. (AR 186.) Following dinner, Plaintiff goes back to bed. (AR 186.) Plaintiff is unable to perform the cooking, cleaning, and shopping, and she does not drive a car. (AR 187.) Plaintiff needs reminders to take her medication and perform other tasks so that she will not forget. (AR 188.) Plaintiff does a load of laundry approximately once a week, but she cannot stand or walk for very long to perform house or yard work. (AR 189.) Further, she does not go out alone because she experiences dizziness and "needs help." (AR 189.) Plaintiff reads and makes cards as a hobby, but she cannot perform these

activities for very long. (AR 190.) In terms of social activities, Plaintiff spends time talking on the phone with others, particularly her mother, about once a week. (AR 190.)

Plaintiff's functional abilities are also limited, according to Mr. Abeloe. While Plaintiff can lift 10 pounds, she requires rest after walking approximately 50 feet. (AR 191.) Her concentration is limited and Plaintiff can only focus for five to 10 minutes. (AR 191.) She uses a cane when walking. Plaintiff breaks down at any amount of stress, and she does not handle a change in routine well. (AR 192.)

## C.   Administrative Proceedings

The Commissioner denied Plaintiff's application initially and again on reconsideration. (AR 65-87, 88-92, 96-101.) Consequently, on June 2, 2008, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 102-07.) A hearing was held September 22, 2009, before ALJ Sharon L. Madsen. (AR 27-64.)

### 1.   Plaintiff's Hearing Testimony

Plaintiff testified that she completed high school and had a "couple years of college." (AR 34.) She has a license for to be a cytotechnologist, which she renews every two years hoping that she will be able to use it in the future. (AR 34.) Currently, she struggles with fatigue which prevents her from showering on some days. She does a little cooking, some chopping if she is "up to it," she tries to attend church when she is able, but she does not have any hobbies anymore. (AR 36.) On a typical day she spends her time getting the children up and ready for their day, if she is feeling up to it, she will shower; then she will rest. She is usually sitting most of the time, but she takes breaks from that occasionally. (AR 36.) She naps every day at least once, and twice on "bad days." (AR 36.) She will prepare dinner if she is feeling well enough, otherwise her husband will do it. (AR 36.) Plaintiff struggles to read because she cannot remember what she read, but she does watch some television on certain nights. (AR 36-37.)

As to her work history, Plaintiff testified that she started to work in a lab in 1994 performing a kind of data entry. (AR 37-38.) She also worked as a certified nurse assistant. In that job she lifted people and performed care for patients who were mentally ill. (AR 39.)

1    Regarding her pain and limitations, Plaintiff testified that she suffers from migraine

2  headaches that cause burning pain. (AR 40.)  These headaches require her to lie down in a dark

3  room with a fan going; they also cause nausea. (AR 40.)  She suffers from these headaches up to

4  three times a week. (AR 40.)  Plaintiff takes Imitrex, but she has started to be hesitant about taking

5  it because it makes her feel like she is going to have a heart attack. (AR 40.)

6    Plaintiff's chronic fatigue is "overwhelming." (AR 41.)  It affects her arms, legs, and feet

7  most. (AR 41.)  It results in a burning feeling on her feet, and then like her feet are being crushed

8  in a vice. She also experiences shooting pain through her arms and legs. Her muscles burn, ache,

9  and spasm. (AR 41.)  She suffers from these symptoms daily. (AR 41.)  The pain is exacerbated by

10  activity, but is also worse in the heat. (AR 42.)  Walking is the postural activity that causes her the

11  most discomfort, but all her postural stances such as sitting, standing, or walking, must be rotated

12  because she cannot hold one posture for a very long period of time. (AR 42.)  Sitting is better if she

13  raises her feet, but if she is not able to do so, she tends to shift a lot, "trying to get off spots that hurt."

14  (AR 42.)  She spends five or six hours a day sitting with her legs elevated. (AR 48.)  For her pain

15  she takes Ibuprofen, Flexural, and Tegretol. (AR 42.)  The pain medication "helps some." (AR 42.)

16  However, the Tegretol is "not working on the [her] leg pain." (AR 42.)  She also takes Naltrexone

17  to treat the chronic fatigue. (AR 44.)

18    Plaintiff also takes medication for high blood pressure, which she is working with her doctor

19  to get under control. (AR 43.)  She takes Meformin for diabetes. (AR 43.)  Her sugar levels have

20  been under control. (AR 44.)  Plaintiff also suffers from interstitial cystitis, which is a daily problem

21  that "waxes and wanes." (AR 44.)  This condition requires her to use the restroom every 15 to 30

22  minutes on bad days, which occur three to four times per week. (AR 49.)  She is prescribed Ditropan

23  to treat the condition. (AR 50.)  She experiences dizziness that comes and goes, but this does not

24  seem to be a side-effect of her medication. (AR 44.)

25    Plaintiff testified that she can lift ten pounds with her right hand and arm, but only for a

26  couple of seconds. (AR 45.)  She cannot lift that much weight with her left arm. (AR 45.)  She can

27  sit for approximately 20 to 30 minutes, and can stand five to ten minutes before she must sit down.

28

(AR 46.)  She can walk a block or two, and she uses a cane on days when she is having difficulty balancing.  (AR 46.)

She also suffers from depression and anxiety.  (AR 46.)  She never knows from day to day how she is going to feel, but she does not seem to find any pleasure in doing anything anymore. (AR 46.)  She cannot do anything with friends, and she feels isolated which makes her feel worse. (AR 47.)  She takes Zoloft, Effexor, and Xanax to treat her depression and anxiety issues.  (AR 47.) She experiences difficulty concentrating and paying attention to things, and ten minutes is the maximum amount of time she can pay attention to any particular project.  (AR 51.)  This difficulty concentrating is a reason why she has trouble driving.  (AR 51.)

### 2.     Mr. Abeloe's Hearing Testimony

Mr. Abeloe testified at the hearing that he has observed that his wife appears to be in pain when she moves, for example, if she gets up, she moans.  (AR 53.)  He has noticed that she makes frequent trips to the restroom.  (AR 53.)  He observed that she cannot stand for very long or walk very far.  (AR 53.)  She also uses a cane.  (AR 54.)  She can sit for a "little bit of time," as long as her legs are elevated.  (AR 54.)  She is unable to do many things; she is not able to get up, cook a meal, deal with the children, or grocery shop.  (AR 54.)  Plaintiff often does not hear things Mr. Abeloe says to her, and thus he believes she has difficulty concentrating.  (AR 54.)  Mr. Abeloe also testified that Plaintiff has difficulty carrying or lifting weight with her hands because he observed that she drops things, and certain things are more difficult for her to lift.  (AR 55.)  As a result, Mr. Abeloe generally takes care of things "like all the shopping and cooking and taking care of the kids and that."  (AR 55.)

### 3.     Vocational Expert's Testimony

A vocational expert ("VE") also testified at the hearing.  (AR 56-62.)  The VE characterized Plaintiff's past work as a laboratory clerk as light and semi-skilled and her work as a CNA as medium and semi-skilled.  (AR 56-57.)  She had acquired transferable skills, which included knowledge of how to enter data into a computer.  The ALJ also posed several hypothetical scenarios for the VE to consider.

The first hypothetical posed by the ALJ assumed a person of the same age and with the same education and work background as Plaintiff. This hypothetical person was assumed to be able to lift and carry 50 pounds occasionally, 25 pounds frequently, and would be able to sit/stand or walk six hours out of an eight-hour workday. (AR 58.) The VE testified that such a person would be able to perform Plaintiff's past work as a laboratory clerk, but not as a CNA. (AR 58.)

The ALJ posed a second hypothetical that was the same as the first in all respects, but assumed that the person would only be able to perform light work and could lift 20 pounds occasionally and 10 pounds frequently. (AR 58.) The VE testified that such a person would be able to perform Plaintiff's past work as a laboratory clerk, but not as a CNA. (AR 58.)

In a third hypothetical, the ALJ asked the VE to consider a hypothetical person restricted in the same manner as in the second hypothetical, but with the added limitation to simple, routine work. (AR 58.) The VE testified that such a hypothetical person would not be able to perform any of Plaintiff's past work. (AR 58.) However, such a person could perform other light, unskilled work including that of mail clerk, photocopy operator, or counter clerk. (AR 58-59.)

In a fourth hypothetical, the ALJ asked the VE to consider a hypothetical person of the same age, education, and work history as Plaintiff who was limited to performing sedentary work and could only lift 10 pounds occasionally and less than 10 pounds frequently, and who could sit, stand, and walk two hours in an eight-hour day. The ALJ also limited this hypothetical person to simple, routine tasks. (AR 59.) The VE testified that such a person would be able to perform a "full range of unskilled sedentary work," including that of a telephone quotation clerk, an assembler, and a charge account clerk.

In a fifth hypothetical, the ALJ posed a person who had all the limitations of the fourth hypothetical, but who would also need to take four breaks per day of at least 15 to 30 minutes, and would also require access to the restroom as needed. (AR 59.) The VE testified that such a person would not be able to perform any work. (AR 60.)

Plaintiff's representative also posed hypotheticals for the VE to consider. (AR 60-62.) Plaintiff's representative asked the VE to consider a person who was limited to light work, but was limited as Dr. Hirokawa described in his functional assessment of Plaintiff. (AR 60-61.) The VE

was asked whether such a person would be able to perform Plaintiff's past relevant work. (AR 61.)

The VE testified as follows:

> With a mild limitation, the answer would be yes, but with a moderate, the answer is no. So, presumably part of the time, part of the work week or part of the work month, whatever timeframe you want to address, or at the moderate level, I would say no. I would say one of – in a similar situation that if she was at moderate level enough, meaning at least, meaning more than two, three times . . . a month, where she is going to miss work because of the – or not function at work because of being at moderate level, she would end up losing her job.

(AR 61.)

Plaintiff's representative also asked the VE whether a person who frequently experienced pain or fatigue or other symptoms severe enough to interfere with concentration and pace could perform Plaintiff's past relevant work. (AR 62.) The VE testified that a person limited in this way could not perform Plaintiff's past relevant work or any other work in the national economy. (AR 62.)

### 3. The ALJ's Decision

On November 18, 2009, the ALJ issued a decision that found Plaintiff not disabled from May 2, 2003, through the date of the ALJ's decision. (AR 12-22.) Specifically, the ALJ found that Plaintiff (1) has not engaged in substantial gainful activity since May 2, 2003; (2) has the following severe impairments: obesity, fibromyalgia/chronic fatigue, depression, anxiety, obsessive compulsive disorder, and personality disorder; (3) does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) has the Residual Functional Capacity ("RFC")[2] to lift and carry 20 pounds occasionally and 10 pounds frequently; sit, stand and/or walk for six hours in an eight-hour workday, and perform simple, routine tasks; (5) is unable to perform any past relevant work; but (6) can perform jobs in the national economy that exist in significant numbers. (AR 12-22.)

---

[2] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

1    On January 6, 2010, Plaintiff sought review of this decision before the Appeals Council.

2 (AR 7.)   The Appeals Council denied review on June 24, 2011. (AR 1-6.)   Therefore, the ALJ's

3 decision became the final decision of the Commissioner.  20 C.F.R. §§ 404.981, 416.1481.

4 **C.    Plaintiff's Contentions on Appeal**

5    On August 11, 2011, Plaintiff filed a complaint before this Court seeking review of the ALJ's

6 decision.  Plaintiff seeks a reversal of the final decision of the Commissioner asserting that the ALJ

7 failed to properly consider the medical evidence and the lay testimony offered in support of

8 Plaintiff's claim.  (Doc. 11.)

9                              <u>**SCOPE OF REVIEW**</u>

10    The ALJ's decision denying benefits "will be disturbed only if that decision is not supported

11 by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir.

12 1998).  In reviewing the Commissioner's decision, the Court may not substitute its judgment for that

13 of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  Instead, the Court must

14 determine whether the Commissioner applied the proper legal standards and whether substantial

15 evidence exists in the record to support the Commissioner's findings.  *See Lewis v. Astrue*, 498 F.3d

16 909, 911 (9th Cir. 2007).

17    "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v.

18 Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such

19 relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

20 *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305

21 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both the

22 evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may

23 not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*,

24 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

25                              <u>**APPLICABLE LAW**</u>

26    An individual is considered disabled for purposes of disability benefits if he or she is unable

27 to engage in any substantial, gainful activity by reason of any medically determinable physical or

28 mental impairment that can be expected to result in death or that has lasted, or can be expected to

1    last, for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A),

2    1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).   The impairment or

3    impairments must result from anatomical, physiological, or psychological abnormalities that are

4    demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of

5    such severity that the claimant is not only unable to do his previous work, but cannot, considering

6    his age, education, and work experience, engage in any other kind of substantial, gainful work that

7    exists in the national economy.   42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

8          The regulations provide that the ALJ must undertake a specific five-step sequential analysis

9    in the process of evaluating a disability.   In the First Step, the ALJ must determine whether the

10   claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§ 404.1520(b), 416.920(b).

11   If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment

12   or a combination of impairments significantly limiting her from performing basic work activities.

13   *Id.* §§ 404.1520(c), 416.920(c).   If so, in the Third Step, the ALJ must determine whether the

14   claimant has a severe impairment or combination of impairments that meets or equals the

15   requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1.   *Id.*

16   §§ 404.1520(d), 416.920(d).   If not, in the Fourth Step, the ALJ must determine whether the claimant

17   has sufficient RFC despite the impairment or various limitations to perform her past work.   *Id.*

18   §§ 404.1520(f), 416.920(f).   If not, in the Fifth Step, the burden shifts to the Commissioner to show

19   that the claimant can perform other work that exists in significant numbers in the national economy.

20   *Id.* §§ 404.1520(g), 416.920(g).   If a claimant is found to be disabled or not disabled at any step in

21   the sequence, there is no need to consider subsequent steps.   *Tackett v. Apfel*, 180 F.3d 1094, 1098-

22   99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## DISCUSSION

23

24   **A.       The ALJ's Consideration of the Medical Evidence**

25          Plaintiff first challenges the ALJ's consideration of the medical evidence, asserting that the

26   ALJ failed to provide legally sufficient reasons for rejecting portions of Dr. Hirokawa's opinion and

27   the August 2009 opinion of Dr. Mating.

28

1        **1.     Legal Standard**

2        The medical opinions of three types of medical sources are recognized in Social Security

3  cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat

4  the claimant (examining physicians); and (3) those who neither examine nor treat the claimant

5  (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).   Generally, a

6  treating physician's opinion should be accorded more weight than opinions of doctors who did not

7  treat the claimant, and an examining physician's opinion is entitled to greater weight than a

8  non-examining physician's opinion. *Id.*  Where a treating or examining physician's opinion is

9  uncontradicted by another doctor, the Commissioner must provide "clear and convincing" reasons

10  for rejecting the treating physician's ultimate conclusions. *Id.*  If the treating or examining doctor's

11  medical opinion is contradicted by another doctor, the Commissioner must provide "specific and

12  legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by

13  substantial evidence in the record. *Id.* at 830-31; *accord Valentine v. Comm'r Soc. Sec. Admin.*,

14  574 F.3d 685, 692 (9th Cir. 2009).   The ALJ can meet this burden by setting out a detailed and

15  thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof,

16  and making findings. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

17        **2.     The Opinion of Dr. Hirokawa**

18        Plaintiff argues that the ALJ improperly rejected Dr. Hirokawa's opinion in finding that it was

19  neither supported by the mental status examination Dr. Hirokawa conducted nor Plaintiff's

20  longitudinal medical history.   Plaintiff asserts the ALJ's reasoning is not supported by the

21  record.  The ALJ provided the following analysis of Dr. Hirokawa's opinion:

22        Dr. Hirokawa performed a consultative psychological evaluation [of Plaintiff] on
          November 17, 2007 (Exhibit 4F). Dr. Hirokawa opined that the claimant's symptoms
23        of depression and anxiety appeared to be within the mild range, with fair
          communication skills (Exhibit 4F, page 4). He further opined that the claimant was
24        able to perform a simple three-step command and that she had a Global Assessment
          of Functioning (GAF) rating of 61 (Exhibit 4F, pages 4-5). I give significant weight
25        to his opinions regarding her mental status examination because they are supported
          by the record and consistent with my findings. However, I give little weight to Dr.
26        Hirokawa's conclusion that the claimant has mild to moderate limitations in her
          ability to complete a normal workday and work[week] without interruptions at a
27        consistent pace, mild to moderate limitations in her ability to interact with coworkers,
          and mild to moderate limitations in her ability to deal with changes in the workplace,
28        and a minimal to moderate likelihood of her deteriorating (Exhibit 4F, pages 5-6).

13

These conclusions are not supported by her mental status examination or the longitudinal medical history.

(AR 19-20.)  As to her longitudinal mental health history, the ALJ discussed the following:

> Medical records document her depression, anxiety, obsessive compulsive disorder and personality disorder (Exhibits 2F, pages 90, 92, and 169; 4F, pages 5; 15F, page 2.)  However a careful review of the record does not support the claimant's allegations of debilitating mental symptoms either.  She received medication for her depression and anxiety, although[] she stopped taking Zoloft and propranolol on her own (Exhibit 2F, page 152). She reported fear of germs and dirt and her compulsions focused primarily on washing hands; however, by her own report, she was doing "much better" (Exhibit 2F, pages 31 and 148).  It appears her mental impairments were well-controlled with conservative treatment, but she seems overwhelmed with having three children, including a young child with development delays (Exhibit 15F, page 4.)

(AR 18.)

Dr. Hirokawa's opinion was contrary in some regards to the opinions offered by Dr. Mating and Dr. Murillo (AR 447-449) as to the severity of Plaintiff's mental functioning.  Thus, to reject a portion of Dr. Hirokawa's opinion, the ALJ was required to state specific and legitimate reasons for doing so.  *Lester*, 81 F.3d at 830-31.

Plaintiff offers a limited argument that the ALJ's reasoning is not supported by the record, and proceeds to list Plaintiff's various diagnosed mental conditions.  (Doc. 11, p. 12-13.)  The Court surmises that Plaintiff is asserting that her longitudinal medical record includes diagnoses for a range of mental disorders; thus, Dr. Hirokawa's opinion that she is mildly to moderately limited in her ability to complete a normal workday or workweek without interruptions, interact with co-workers, and deal with changes in the workplace is supported by her longitudinal medical records, contrary to the ALJ's conclusion.  This argument misses the mark, however, because various diagnoses in the medical records have very little bearing on the *severity* of Plaintiff's symptoms and whether she is mildly to moderately limited in the manner Dr. Hirokawa opined.

The Commissioner asserts that the ALJ's reasons for rejecting Dr. Hirokawa were legally sufficient because the overall medical record shows a lack of objective and clinical findings, conservative treatment, and positive response to medication.  This argument, too, fails to adequately address the ALJ's reasoning.

Perhaps part of the parties' struggle to present any persuasive arguments is that the ALJ's rejection of Dr. Hirokawa is predicated on two conclusions, rather than a discussion of the evidence.

14

1   Moreover, after rejecting a few portions of Dr. Hirokawa's opinion, the ALJ then credited the rest

2   of the limitations Dr. Hirokawa opined that Plaintiff experienced.  This is permissible to the extent

3   the ALJ provides an adequate explanation for doing so, but here the Court is left with a discussion

4   of Dr. Hirokawa's opinion that lacks specificity and is too conclusive for judicial review.

5   Specifically, Dr. Hirokawa, following a mental status examination, concluded that Plaintiff is

6   **<u>mildly to moderately limited</u>** in the ability to:

7   (1)   remember locations and work-like procedures;

8   (2)   understand and remember detailed instructions;

9   (3)   carry out very short and simple instructions;

10   (4)   maintain attention and concentration for extended periods;

11   (5)   accept instructions from supervisors and respond appropriately to criticism;

12   (6)   exercise social judgment and awareness of socially appropriate behavior;

13
14   (7)   perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;

15   (8)   function independently and sustain an ordinary routine without special supervision;

16   (9)   complete a normal workday/workweek without interruptions from psychologically based symptoms and perform at a consistent pace;

17
18   (10)   interact with co-workers and the general public; and

19   (11)   withstand the stress of a routine workday and deal with various changes in the work setting.

20   (AR 415-16.)

21   Dr. Hirokawa opined that Plaintiff was only mildly limited in the ability to understand and

22   remember very short and simple instructions (AR 415), and the likelihood that she would

23   emotionally deteriorate in a work environment was minimal to moderate (AR 416).  The ALJ gave

24   "significant weight" to Dr. Hirokawa's opinion as to the above-described limitations because the ALJ

25   considered it "supported by the record and consistent with [the ALJ's] findings." (AR 19.) However,

26   the ALJ gave little weight to Dr. Hirkawa's opinion as to the degree of limitations in Plaintiff's ability

27   to complete a normal workday and workweek without interruptions, her ability to interact with

28

1   coworkers, and to deal with changes in the workplace, as well as the minimal to moderate likelihood

2   that she would deteriorate in the workplace.  (AR 19-20.)

3        In discounting select portions of Dr. Hirokawa's opinion, the ALJ reasoned that neither the

4   status examination nor Plaintiff's longitudinal medical history supported mild to moderate limitations

5   in certain of Plaintiff's abilities.  The ALJ is entitled to select portions of a physician's opinion to

6   credit while rejecting others, so long as the ALJ provides legally sufficient reasons for doing so.

7   *Magallanes v. Bowen*, 881 F.2d 747, 754 (9th Cir. 1989).  Here, however, it is unclear how the status

8   examination results supported every other "mild to moderate" limitation to which Dr. Hirokawa

9   opined as to Plaintiff's functional abilities, but not those related to Plaintiff's ability to complete a

10  normal workday and workweek, interact with coworkers, deal with changes in the workplace, and

11  the minimal to moderate likelihood Plaintiff would experience deterioration in the workplace.

12       The ALJ is also entitled to discredit a physician's opinion to the extent it is conclusory or

13  unsupported by clinical findings.  *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)

14  (an ALJ need not accept the opinion of a doctor if it is inadequately supported by clinical findings).

15  However, by stating that the status examination results supported some mild to moderate limitations

16  but not others without any explanation or discussion of the status examination results, it appears that

17  the ALJ arbitrarily discredited portions of Dr. Hirokawa's opinion.

18       Further, the ALJ's statement that the longitudinal history does not support the particular

19  limitations the ALJ chose not to credit is entirely too general and non-specific.  *See Embrey v.*

20  *Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988) ("To say that medial opinions are not supported by

21  sufficient objective findings or are contrary to the preponderant conclusions mandated by the

22  objective findings does not achieve the level of specificity our prior cases have required, even when

23  the objective factors are listed seriatim.").  The ALJ's notation that Plaintiff's treatment for her

24  mental impairments was conservative and that her impairments were well-controlled by medication

25  does not assist the Court in determining the reasons why the ALJ concluded that some of Plaintiff's

26  limitations were accurately described by Dr. Hirokawa as mild to moderate and thus credited by the

27  ALJ, while other limitations were inaccurately characterized by Dr. Hirokawa as mild to moderate,

28

and thus rejected.  In sum, the ALJ failed to provide specific and legitimate reasons to selectively

discredit portions of Dr. Hirokawa's opinion.

### 2.    ALJ's Consideration of Dr. Mating's Opinion

Plaintiff argues that the ALJ rejected Dr. Mating's opinions regarding Plaintiff's functional

abilities without providing specific and legitimate reasons for doing so.  The ALJ provided the

following analysis of Dr. Mating's opinion regarding Plaintiff's functioning:

> As for the opinion evidence, treating physician Dr. Mating opined in August 2009
> that the claimant was unable to work due to fibromyalgia and trigeminal neuralgia,
> and chronic fatigue syndrome (Exhibit 18F, page 2). He opined that the claimant can
> maintain attention for only 5 minutes, was incapable of even "low stress" jobs, can
> rarely lift 10 pounds or less, rarely look up, and rarely hold her head in a static
> position, can walk 1/2 block without rest or severe pain, can sit and stand and/or walk
> 15 minutes at a time and less than 2 hours in an 8[-]hour workday, with limitations
> on posturals and manipulative limitations (Exhibit 18F, pages 5-6).  The doctor's
> conclusions are on an issue specifically reserved under the Regulations to the
> Commissioner (20 C.F.R. 404.1427(e), 416.927(e), and SSR 96-5p).  In addition,
> controlling weight may not be given to a treating source's medical opinion unless the
> opinion is well-supported by medically acceptable clinical and laboratory diagnostic
> techniques and not inconsistent with other substantial evidence in the case record
> ([SSR] 96-2p).  Dr. Mating's report appears to be based on the claimant's own
> diagnoses of fibromyalgia, chronic pain and trigeminal neuralgia in her efforts to
> obtain SSI benefits, and adopted without objective medical evidence to support it
> (Exhibits 16F, page 10; 18F, page 2).  His limitations are in contradiction to the
> claimant's reported activities of daily living.  For these reasons, Dr. Mating's opinions
> are neither controlling nor persuasive (20 C.F.R. 404.1527(d), 416.927(d), and SSR
> 96-2p).

Plaintiff asserts that she disagrees with the ALJ's reasons for rejecting Dr. Mating's opinion

and notes many occasions in the record where Plaintiff was diagnosed with fibromyalgia by

physicians at the Family HealthCare Network.  (Doc. 11, p. 14-15.)  Plaintiff asserts that

fibromyalgia and chronic pain have been diagnosed by doctors and treating sources since 2005, and

this corroborates and supports Dr. Mating's diagnosis of fibromyalgia.  (Doc. 11, p. 15.)

Federal courts have recognized that fibromyalgia "often lacks medical or laboratory signs,

and is generally diagnosed mostly on an individual's described symptoms, and that the 'hallmark' of

fibromyalgia is therefore 'a lack of objective evidence.'"  *Moore v. Barnhart*, 405 F.3d 1208, 1211

(11th Cir. 2005) (internal citations omitted); *see also Benecke v. Barnhart*, 379 F.3d 587, 594 (9th

Cir. 2004) (ALJ erred by "effectively requiring objective evidence for a disease that eludes such

measurement").  Therefore, the lack of objective clinical findings is, at least in the case of

1     fibromyalgia, insufficient alone to support an ALJ's rejection of a treating physician's opinion as to

2     the claimant's functional capacity.

3         The ALJ noted that Dr. Nowlan, the agency consultative physician, reviewed Plaintiff's

4     medical records and reported that, although there was a diagnosis of fibromyalgia, there was nothing

5     to indicate why the diagnosis was made. (AR 407.) Although it is not clear to what medical record

6     Dr. Nowlan is referring in his report, the medical records do indicate Plaintiff reported chronic pain

7     over the course of her continuing treatment at the Family HealthCare Network, and the doctors and

8     medical professionals diagnosed her pain issues as fibromyalgia. (*See, e.g.,* AR 452, 454, 479, 485,

9     494, 499.) That the diagnoses of fibromyalgia were not well-supported with clinical findings is not

10    especially remarkable given the nature of fibromyalgia. Further, the record sufficiently demonstrates

11    the types of clinical notations, e.g., Plaintiff's subjective reports of chronic pain – the hallmark of

12    fibromyalgia in any event. Moreover, the ALJ essentially credited the diagnoses of fibromyalgia by

13    determining that Plaintiff's fibromyalgia was medically determinable and constituted a severe

14    impairment at the Second Step. (AR 14-15.) Thus, to the extent the ALJ discredited Dr. Mating's

15    opinion because Plaintiff's diagnoses of fibromyalgia are not well-supported with clinical findings,

16    such a reason is not a specific and legitimate reason under these circumstances.

17        The Court hastens to note, however, that the degree of limitation imposed by Dr. Mating do

18    appear extreme in view of the clinical records in this case and the types of findings one would expect

19    with debilitating complaints of chronic pain diagnosed as fibromyalgia and chronic fatigue but are

20    absent from the medical records here. For example, although Dr. Mating reported that Plaintiff had

21    multiple trigger and tender points (AR 553), he failed to discuss where in Plaintiff's records those

22    were found or point to any medical treatment notes recording such findings. In fact, when

23    referencing clinical findings to support Plaintiff's fibromyalgia, he recorded that Plaintiff indicated

24    that it "hurts everywhere especially arms [and] legs." (AR 552.) Thus, the question is not whether

25    the fibromyalgia diagnosis is supported by clinical findings; rather, the relevant question is whether

26    the diagnosed fibromyalgia limits Plaintiff to the degree that Dr. Mating has opined.

27        Plaintiff's treatment records from Dr. Mating's office do very little to establish how often

28    Plaintiff suffers the pain she reports, the average amount of pain during such intervals, or the degree

1   to which the medication relieves her pain.  While Dr. Mating did note in his August 2009 opinion

2   in conclusory fashion that Plaintiff experienced pain every day at a level of 6 out of 10, he references

3   no treating records.  Further, Dr. Mating does not discuss the different treatment modalities utilized

4   to combat what, in Dr. Mating's opinion, is a profoundly debilitating condition, nor does Dr. Mating

5   discuss the longitudinal progression of her condition in any specific terms or offer any prognosis of

6   her condition.  This lack of detail is particularly notable in that Plaintiff was treated in Dr. Mating's

7   office at the Family HealthCare Network on a monthly basis between 2002 and 2009.  (AR 552.)

8   For such an allegedly debilitating impairment with a seven-year treatment history, there is a

9   considerable lack of attention given it by the medical professionals in the treatment notes.  The

10  conclusory nature of Dr. Mating's August 2009 opinion and the lack of details in discussing

11  Plaintiff's condition does appear to render it less probative.  *See Batson v. Comm'r of Soc. Sec.*

12  *Admin.*, 359 F.3d 1190, 1019 (9th Cir. 2004) (ALJ need not accept the opinion of a treating physician

13  "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the

14  record as a whole").  Nevertheless, this is not reasoning the ALJ offered in the first instance; it is the

15  province of the ALJ, not the Court, to assess the medical evidence.  The Court cannot affirm the

16  ALJ's conclusion on grounds that were not invoked by the agency.  *Ceguerra v. Sec'y of Health &*

17  *Human Servs.*, 933 F.2d 735, 738 (9th Cir. 1991).  Therefore, the Court turns to consider the other

18  reason offered for rejecting Dr. Mating's opinion regarding the extent and severity of Plaintiff's

19  limitations.

20      The ALJ  refused to give controlling weight to Dr. Mating's opinion because it was contrary

21  to Plaintiff's stated daily activities.  The ALJ noted that, although Plaintiff alleged incapacitating

22  pain, she also reported she is able to drive, go grocery shopping, prepare meals, and take care of her

23  children.  (AR 18, 175-78.)  Dr. Mating opined that Plaintiff can only maintain attention for 5

24  minutes and is incapable of even "low stress" jobs.  Plaintiff's report that she cares for her young

25  children does appear inconsistent with an ability to maintain attention for only 5 minutes.  Further,

26  Plaintiff also reported to Dr. Hirokawa that she cooks, does light chores, and watches the children.

27  (AR 18, 414.)  In discrediting Plaintiff's hearing testimony, the ALJ noted that Plaintiff  "greatly

28  minimized her ability to function," reporting that she could only lift and/or carry 10 pounds, stand

for 5-10 minutes, walk 1-2 blocks, and sit 20-30 minutes. (AR 18.) Thus, Plaintiff's reported daily activities that were credited by the ALJ were inconsistent with Dr. Mating's limitations. This is a specific and legitimate reason to give less weight to Dr. Mating's opinion. *Tommasetti*, 533 F.3d at 1041 (not improper to reject an opinion largely based on claimant's discredited subjective complaints or presenting inconsistencies between the opinion and the medical record or a claimant's daily activities).

In sum, the ALJ's rejection of Dr. Mating was supported by at least one specific and legitimate reason and is supported by substantial evidence; thus, the ALJ's conclusion as to the weight to be afforded to the opinion is legally sufficient. Any error in rejecting Dr. Mating's diagnosis of fibromyalgia as unsupported by objective clinical findings is harmless. *Tommasetti*, 533 F.3d at 1042 (error is harmless if it is inconsequential to the ultimate disability determination) Nonetheless, as this case is being remanded to the ALJ for renewed consideration of Dr. Hirokawa's opinion, the ALJ will have an opportunity to remedy this error and, in doing so, may reconsider the decision with regard to Dr. Mating if such reconsideration is deemed warranted.

**B.     The ALJ's Consideration of Mr. Abeloe's Testimony**

Lay testimony as to a claimant's symptoms or how an impairment affects the claimant's ability to work is competent evidence that the ALJ must take into account. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996). The Ninth Circuit has held that competent lay witness testimony cannot be disregarded without comment, *id*, and that to discount it, the ALJ "must give reasons that are germane to each witness, *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).

The ALJ considered Mr. Abeloe's lay testimony regarding his observations of Plaintiff's symptoms. (AR 19.) However, the ALJ did "not consider [his] statement very probative in relation to the medical sources of evidence," it mirrored Plaintiff's report which the ALJ discredited, and because Mr. Abeloe is her husband and is "likely not a disinterested party." (AR 19.)

Because the Court remands this case for renewed consideration of the medical evidence, the Court dispenses with an exhaustive analysis of the ALJ's assessment of Mr. Abeloe's lay statements. Consideration of lay testimony is inescapably linked to conclusions regarding the medical evidence. 20 C.F.R. § 416.929. Here, the ALJ found Mr. Abeloe's statements less probative in light of the

medical evidence of record.  As such, Mr. Abeloe's testimony may be reconsidered by the ALJ if warranted after renewed consideration of Dr. Hirokawa's opinion.

**C.      Remand is Warranted**

As a general rule, remand is warranted where additional administrative proceedings could remedy the defects in the Commissioner's decision.  *See Harmon v. Apfel*, 211 F.3d 1172, 1179 (9th Cir. 2000), *cert. denied*, 531 U.S. 1038 (2000).  In this case, remand is appropriate for renewed consideration of Dr. Hirokawa's opinion.  The ALJ is instructed to take whatever further action is deemed appropriate consistent with this decision.

<u>**CONCLUSION**</u>

After consideration of the Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, REVERSED and the case REMANDED to the ALJ for further proceedings consistent with this order.  The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff TRISTA DAWN ABELOE and against Defendant Michael J. Astrue, Commissioner of Social Security.

IT IS SO ORDERED.

Dated:      January 22, 2013                              /s/ Sheila K. Oberto
                                                    UNITED STATES MAGISTRATE JUDGE